UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BARBARA FRYE,
on behalf of A.O.,

                                        Plaintiff,

        v.                                                      5:10-CV-98
                                                                (GTS/ATB)

COMMISSIONER OF SOCIAL
SECURITY,

                                        Defendant.
_____

JAYA SHURTLIFF, ESQ., for Plaintiff
MARIA P. FRAGASSI SANTANGELO, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

### REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation by the Honorable

Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I.      PROCEDURAL HISTORY

        Plaintiff Barbara Frye filed an application for Supplemental Security Income

("SSI") payments on behalf of her son, A.O.,[1] on January 8, 2007, claiming disability

since April 1, 2003.  (Administrative Transcript ("T.") at 100-102).  Plaintiff's

application was initially denied on May 9, 2007 (T. 71-74), and she made a timely

request for a hearing before an Administrative Law Judge ("ALJ") on June 26, 2007

---

[1] Throughout this Report, the child on whose behalf this action was brought will be
generally referred to as "the claimant" or by his initials  "A.O."  Barbara Frye, who commenced
this action on behalf of her son, will generally be referred to as "the plaintiff."

(T. 75).  The hearing, at which plaintiff appeared with claimant, was conducted on

June 30, 2009.  (T. 9-52).

In a decision dated September 2, 2009, the ALJ found that A.O. was not

disabled.  (T. 57-70).  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on

December 22, 2009.  (T. 1-4).

## II.    ISSUES IN CONTENTION

The plaintiff makes the following arguments:

1.    The ALJ's determination that the claimant did not meet any "listed"
      impairment was not supported by substantial evidence; and the ALJ
      failed to develop the record by not making reasonable attempts to obtain
      formal  opinions from two treating physicians regarding the listings and
      functional equivalence analysis.

2.    The ALJ did not apply the appropriate legal standards in evaluating
      plaintiff's credibility with respect to her statements about the intensity,
      persistence, and limiting effects of her son's symptoms.

3.    The ALJ erred when he found A.O.'s impairments were not functionally
      equivalent to a listed impairment.

(Pltf.'s Brief at 1, Dkt. No. 11).

This court concludes that, although the ALJ failed to articulate a direct rationale

for his listing determination, there was substantial evidence in the ALJ's decision and

in other credible medical evidence which clearly indicated that the claimant's

conditions did not meet or medically equal the most relevant listed impairments.

There was also substantial evidence supporting the ALJ's conclusion that A.O.'s

2

impairments were not functionally equivalent to a listed impairment.  This court also finds that the ALJ applied the appropriate legal standards in assessing the credibility of plaintiff's statements about the intensity and limiting effect of her son's symptoms. Finally, this court concludes that the ALJ made reasonable efforts to obtain medical evidence from all relevant treating sources, and finds that the record was adequate and sufficient for the ALJ to make his disability determination.

## III.   FACTUAL OVERVIEW

The court will only briefly summarize the medical, educational, and other evidence, which is set forth at length in both the plaintiff's brief (at 2-17) and the Commissioner's brief (Deft.'s Brief at 1-10, Dkt. No. 15).  Relevant details of the medical and educational evidence, and the testimony of the plaintiff, are discussed below in the course of analyzing the issues disputed by the parties.

### A.   Educational Evidence

A.O. is a male who was born, a month premature and weighing under four pounds, in December 2001.  (T. 297, 302-303).  By his second birthday, A.O. started receiving "early intervention" special education and counseling services to address delayed speech and motor skills; inattentiveness and lack of focus; and aggressive/impulsive behavior.  (T. 172-73, 252-58, 269, 303).  When he reached school age, A.O. was maintained in a special education setting, but was mainstreamed into regular classrooms for part of the day.  (T. 36, 199-206, 208-211).  A.O.

3

continued to receive special counseling services,[2] but speech and occupational therapy were discontinued by the time he started school.  (T. 18-19, 211, 221).

The educational evidence in the case involves a multitude of evaluations, reports, behavioral assessments, and individualized education programs ("IEP") from teachers, counselors, school psychologists, evaluation team members, and consultants associated with Oswego County BOCES (T. 172-77, 213-218, 252-62); the New York Office of Mental Retardation and Developmental Disabilities (T. 302-315); Mexico Central Schools (T. 122-136, 219-236); and Fulton City Schools (158-165, 187-89, 199-206, 208-212).  As detailed below, these educational records reflect significant improvement, as A.O. matured, in his cognitive abilities, sensory processing skills, and behavior.  Over the years, claimant's educational classification changed from "student with a disability" to "emotionally disturbed," and, most recently, to "other health impaired."  (T. 122, 159, 189, 214).  The questionnaire completed by A.O.'s first grade teacher in June 2009 states that the claimant had some continuing serious problems in the areas of acquiring and using information; attending and completing tasks; and self-care.  (T. 199-206).

B.   **Medical Evidence**

1.   **Treating Physicians**

The medical evidence in the case included records from several treating

_____

[2]   A.O.'s family had a history of domestic unrest and violence and, by June 2007, he and his mother moved out of the father's home.  (T. 304, 399).

physicians.  Pediatrician Eva Weisner saw A.O. for a variety of medical and other issues from early 2002, shortly after his birth, through late October 2008.  (T. 263-301, 336-370, 391-410).  Following a neuro-developmental consultation by Dr. Louis Pellegrino in October 2006 (T. 333-335), Dr. Weisner began prescribing Adderall to address A.O.'s apparent attention deficit hyperactivity disorder ("ADHD").  (T. 337-38, 401).  Dr. Weisner also treated A.O. for enuresis, and this condition greatly improved.  (T. 394, 395).  In January 2009, A.O. began seeing pediatrician Stuart Trust, M.D., although there is documentation of only one examination by Dr. Trust in the record.  (T. 416).

In the Spring of 2009, A.O. was referred to psychiatrist Alberto Sanchez, M.D. of the Oswego Hospital, Behavioral Services Division to address aggressive misbehavior, motor tics, and hyperactivity.   (T. 413-15).  Dr. Sanchez adjusted A.O.'s medications and, within two months, claimant was much less disruptive and hyperactive in school and at home.  A.O. continued to experience motor tics, and, during the last visit reflected in the medical records, Dr. Sanchez adjusted claimant's medications to try to address that issue.   (T. 411-412).

## 2.    Consultative Sources

In February 2007, following the filing of claimant's SSI application, Speech/Language Pathologist Patricia Munski performed a consultative evaluation of A.O., at the request of the Commissioner.  (T. 371-74).  Ms. Munski concluded that

A.O. was able to follow and understand simple directions and instructions, and to adequately express his wants and needs.  Overall, Ms. Munski determined that A.O. displayed average abilities in both receptive and expressive language,  and did not require speech therapy.  (T. 373).

Kristen Barry, Ph. D., performed a consultative non-verbal intelligence evaluation of A.O. in February 2007.  (T. 375-78).  Dr. Barry concluded A.O. did have some difficulty attending to a task without a lot of structure in place, and some redirection.  However, the claimant was able to understand age-appropriate directions and instructions and complete age-appropriate tasks.  Dr. Barry opined that A.O. appeared to be functioning within an average range of intelligence, with no significant learning delays.   (T. 377).

On May 9, 2007, psychiatrist Karen Prowda completed a childhood disability evaluation form relating to A.O.  (T. 385-90).  Based on her review of the record, Dr. Prowda concluded that A.O. had "severe" impairments.  However, Dr. Prowda concluded that those impairments did not meet, medically equal, or functionally equal any of the listed impairments described in the applicable Social Security regulations. (T. 385).  The psychiatrist opined that A.O. had no impairment in the two areas of moving about and manipulating objects, and health and physical well-being.  Dr. Prowda concluded that A.O. had "less than marked" impairments in four other "domains":  acquiring and using information; attending and completing tasks;

interacting and relating with others; and self-care.  (T. 387-88).

### 3.   The Administrative Hearing

At the administrative hearing held on June 30, 2009, plaintiff testified that A.O.,
age seven years and six months, was about to start summer school, before entering
second grade.  (T. 15-16).  She stated that her son's most serious problems were a
learning disorder and his sometimes aggressive misbehavior.  (T. 17-18).  The plaintiff
also testified about A.O.'s issues with ADHD (T. 20-21), tics (23-24), and enuresis (T.
43-45), and the impact of various medications and treatment regimens on his
symptoms (T. 27-28, 35, 41).  According to plaintiff, A.O. had no difficulties with
physical abilities, such as walking, running, throwing, and swimming.  (T. 31).  The
ALJ briefly questioned the child claimant, who stated that he liked school and playing
with friends.  (T. 46-49).  The ALJ kept the administrative record open after the
hearing, so that the plaintiff could supplement the record with the most recent medical
records from Dr. Sanchez and Dr. Trust.  (T. 49-50).

## IV.   THE ALJ'S DECISION

The ALJ confirmed that the claimant was a school-age child from the date of
the SSI application on January 8, 2007 through the date of the administrative decision
on September 2, 2009.  The ALJ found that A.O. had not engaged in substantial
gainful activity at any time relevant to the administrative decision.  He determined that
the claimant suffered from a number of "severe" impairments:  attention deficit

hyperactivity disorder, oppositional defiant disorder, parent-child relational problem, learning disability, and motor tics.  (T. 60-61)  However, the ALJ found that the claimant did not have any impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (T. 61)  The ALJ further determined that A.O. did not have any impairment that functionally equaled the listings; he found that the claimant had no limitation in moving about and manipulating objects and less than marked limitations in the other five relevant childhood "domains."  (T. 61-69)  Accordingly, the ALJ concluded that A.O. had not been disabled since January 8, 2007, the date the application was filed.  (T. 69)

## V.    APPLICABLE LAW

### A.    Disability Standard[3]

An individual under the age of eighteen is disabled, and thus eligible for SSI benefits, if he or she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(C)(I).  However, that definitional provision excludes from coverage any "individual under the age of

---

[3] This statement of the relevant disability standard is closely based on the opinion of Magistrate Judge Bianchini in *Hudson v. Astrue*, 1:06-CV-1342 (LEK/VEB), 2009 WL 1212114, at *3-4 (N.D.N.Y. Apr. 30, 2009).

[eighteen] who engages in substantial gainful activity. . . ." 42 U.S.C. §

1382c(a)(3)(C)(ii).

By regulation, the agency has prescribed a three-step evaluative process to be

employed in determining whether a child can meet the statutory definition of

disability. 20 C.F.R. § 416.924; *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 487-88

(E.D.N.Y.2003); *Ramos v. Barnhart*, 02 Civ.3127, 2003 WL 21032012, at *7

(S.D.N.Y. May 6, 2003). The first step of the test requires a determination of whether

the child has engaged in substantial gainful activity. 20 C.F.R. § 416.924(b); *Kittles*,

245 F. Supp. 2d at 488. If so, then both statutorily and by regulation, the child is

ineligible for SSI benefits. 42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. § 416.924(b).

If the claimant has not engaged in substantial gainful activity, the second step of

the test requires examination of whether the child suffers from one or more medically

determinable impairments that, either alone or in combination, are properly regarded

as "severe," in that they cause more than a minimal functional limitation. 20 C.F.R. §

416.924(c); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If the

child if found to have a severe impairment, the Commissioner must then determine, at

the third step, whether the impairment meets or equals a presumptively disabling

condition identified in the listing of impairments set forth in 20 C.F.R. Pt. 404, Subpt.

P., App. 1. *Id*. Equivalence to a listing can be either medical or functional. 20 C.F.R.

§ 416.924(d); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If

an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed disability, and the twelve-month durational requirement is satisfied, the claimant will be found to be disabled.  20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

 "Functional" equivalence must be examined only if it is determined that the claimant's impairment does not meet or medically equal the criteria for a listed impairment.  Analysis of functionality is informed by considering how a claimant functions in six main areas referred to as "domains."  20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8.  The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do."  20 C.F.R. § 416.926a(b)(1).  Those domains include: (I) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

Functional equivalence is established by a finding of an "extreme" limitation, meaning "more than marked," in a single domain.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8.  An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(I) (emphasis added).

Alternatively, a finding of disability is warranted if a "marked" limitation is

found in any two of the listed domains.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL

21032012, at *8.  A "marked limitation" exists when the impairment "interferes

seriously with [the claimant's] ability to independently initiate, sustain, or complete

activities."  20 C.F.R. § 416.926a(e)(2)(I).  "A marked limitation may arise when

several activities or functions are impaired, or even when only one is impaired, as long

as the degree of limitation is such as to interfere seriously with the ability to function

(based upon age-appropriate expectations) independently, appropriately, effectively,

and on a sustained basis."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

### B.     Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)

(citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may

not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards

were applied, even if the decision appears to be supported by substantial evidence.

*Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors

justifying his findings with sufficient specificity to allow a court to determine whether

substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d

Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the

determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id.  See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## VI.   ANALYSIS

The ALJ's finding that A.O. had not engaged in substantial gainful activity at any time relevant to the disability determination is not disputed.  There is no challenge to the ALJ's determination that the child claimant had the following severe impairments:  attention deficit hyperactivity disorder, oppositional defiant disorder,

12

parent-child relational problem, learning disability and motor tics.  (T. 60).  However, the plaintiff argues that there was not substantial evidence supporting the ALJ's findings that A.O. did not have any impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Plaintiff further contends that the ALJ erred when he found that A.O.'s impairments were not functionally equivalent to a listed impairment.  Plaintiff also asserts that, in making the disability determination with respect to A.O., the ALJ (1) did not apply the appropriate legal standards in evaluating the credibility of plaintiff's  statements regarding the intensity, persistence, and limiting effects of her son's symptoms and (2) failed to reasonably complete the record by securing opinion evidence from two treating physicians.  For the reasons set forth below, this court concludes the plaintiff's contentions are unpersuasive and recommends that the District Court uphold the determination of the ALJ that A.O. was not disabled.

A.    **Listings Analysis**

In the section of his decision finding that A.O. did not have any condition that met or medically equaled a listed impairment, the ALJ relied, without elaboration, on the findings of Dr. Prowda, the non-examining State agency psychiatrist.  (T. 61).  In her May 9, 2007 report, Dr. Prowda's merely checked a box that stated that the claimant's impairments did not meet, medically equal, or functionally equal the listings, without specifying which listings she considered.  (T. 385).  The only support

for Dr. Prowda's finding were set forth in the section of her report evaluating the six

"domains" that relate to the "functional equivalence" analysis.  (T. 387-88).

Plaintiff argues that the ALJ's listing determination is not supported by

substantial evidence and suggests that two specific listings should have been

addressed:  Listing 112.11 (Attention Deficit Hyperactivity) and Listing 112.07

(Somatoform, Eating and Tic Disorders).  The Second Circuit has recently re-affirmed

that, "[a]lthough . . . an ALJ 'should set forth a sufficient rationale in support of his

decision to find or not to find a listed impairment,' the absence of an express rationale

for an ALJ's conclusions does not prevent us from upholding them so long as we are

'able to look to other portions of the ALJ's decision and to clearly credible evidence in

finding that his determination was supported by substantial evidence.'"  *Salmini v.*

*Commissioner of Social Sec.*, 371 Fed. Appx. 109, 112, 2010 WL 1170133 (2d Cir.

2010) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir.1982)).  As discussed

below, there is substantial evidence in the ALJ's decision and in other credible

medical reports which clearly indicates that the claimant's conditions did not meet or

medically equal the two listed impairments suggested by plaintiff's counsel.

Undoubtedly, the ALJ should have specifically addressed the relevant listings and

provided a more direct rationale for his listing determination.  However, "because this

is not a case 'in which we would be unable to fathom the ALJ's rationale in relation to

evidence in the record,' . . . there is no need for us to remand this case to the ALJ for

14

clarification." *Id.* at 113 (quoting *Berry*, 675 F.2d at 469).[4]

## 1.   **Listing 112.11 (Attention Deficit Hyperactivity)**

To meet the impairment set forth in Listing 112.11 (for ADHD), the record must

contain: (1) medically documented findings of marked inattention, marked

impulsiveness, and marked hyperactivity (2) resulting in a marked impairment in at

least two of the following areas:  age-appropriate cognitive/communicative function;

age-appropriate social functioning; age-appropriate personal functioning; or

maintaining concentration, persistence and pace.  *See* 20 C.F.R. Pt. 404, Subpt. P,

App. 1, at Listing 112.11; *Brown v. Commissioner of Social Security*, 430 F. Supp. 2d

102, 104 (W.D.N.Y. 2005).  For a claimant to demonstrate that he suffers from a listed

impairment, he must meet **all** of the criteria of that listing.  *Sullivan v. Zebly*, 493 U.S.

521, 530 (1990).  An impairment that manifests only some of the criteria does not

qualify.  *Id*.

Although the ALJ did not directly address the ADHD listing, other portions of

his decision and other credible evidence provide substantial support for the ALJ's

general conclusion that the claimant did not suffer from any condition that met or

medically equaled a listed impairment.  The ALJ's opinion (T. 61, 63) referenced the

---

[4] Plaintiff also contends that the ALJ erred by failing to develop the record when he did not make reasonable attempts to obtain opinions from two treating physician regarding the listings and functional equivalence analysis.  Following the discussion of the ALJ's functional equivalence findings below, this court explains its conclusion that the ALJ did make reasonable efforts to obtain medical evidence from the treating physicians, and made a record that provided an adequate basis to make both the listings and the functional equivalence determination.

findings of Dr. Sanchez, the psychiatrist at Oswego Hospital who treated A.O. in the months prior to the administrative hearing.  After changing claimant's medications, Dr. Sanchez observed, on April 23 and May 22, 2009, that A.O. was only "mildly" hyperactive and had "mildly impaired" impulse control.  (T. 411-12).  The ALJ also noted (T. 65) the observations of A.O.'s teacher on June 4, 2009, that the claimant had serious problems focusing long enough to finish assigned activities, and was easily distracted and hard to re-focus.  (T. 201).  However, the teacher also found that the claimant was better at completing tasks when he had adult assistance.  The teacher observed that A.O. had no problem or only a slight problem in paying attention when spoken to directly; sustaining attention during play/sports activities; carrying out single-step instructions; completing class or homework assignments; working without distracting himself or others; and working at a reasonable pace.  (T. 201).  Overall, there was substantial evidence in the ALJ's decision supporting the implicit finding that claimant did not have **marked** inattention, impulsiveness, **and** hyperactivity, as required to meet or medically equal the first criteria of the listing for ADHD.

The failure to satisfy the first set of criteria for the ADHD listing would be sufficient to establish that claimant's condition did not meet or medically equal the listing.  However, there is also substantial evidence in the ALJ's decision and in the record establishing that claimant could not meet the second set of criteria for this listing either.

As discussed in detail below, there was substantial evidence supporting the ALJ's findings that claimant had less than marked impairments in each of the six "domains" relevant to the analysis of whether plaintiff's condition was functionally equivalent to a listed impairment: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. These domains are not identical to, but substantially overlap the four areas of functioning that make up the  second group of criteria for the listing for ADHD: cognitive/communicative function; social functioning; personal functioning; and maintaining concentration, persistence and pace.  *See, e.g., Scullark v. Apfel*, 97 Civ. 7138, 1998 WL 472059, at *6 & n.8 (S.D.N.Y. Aug. 6, 1998).   The evidence adduced by the ALJ to support his finding that claimant had less than marked impairments in each of the six domains provides substantial evidence indicating that claimant did not have marked impairment in at least two of the four functional areas relevant to the analysis of Listing 112.11.

### 2.    Listing 112.07 (Somatoform, Eating and Tic Disorders)

Listing 112.07 sets forth criteria by which a claimant can demonstrate a tic disorder of disabling severity.  These criteria require that the child have persistent and recurrent involuntary, repetitive, rapid, purposeless motor movements affecting multiple muscle groups with multiple vocal tics; or persistent nonorganic disturbance

17

of either vision, speech, hearing, use of a limb, or movement and its control.  *See* 20

C.F.R. Part 404, Subpart P, Appendix 1, Part B, Section 112.07A2.   In addition, as

with Listing 112.11 for ADHD, the criteria for tic and related disorders also require

marked impairments in at least two of the following:  age-appropriate cognitive/

communicative function; age-appropriate social functioning; age-appropriate personal

functioning; and maintaining concentration, persistence, or pace.  *See* 20 C.F.R. Part

404, Subpart P, Appendix 1, Part B, Sections 112.07B, 112.02B2.

Medical records indicate that plaintiff reported to Dr. Sanchez that A.O. began

to experience tics in approximately March 2008, and that the motor tics became worse

in May 2009.  (T. 411, 414-15).  However, during several observations of claimant,

Dr. Sanchez noted only a sniffing tic during one examination, on March 18, 2009.  (T.

414).  Plaintiff has not pointed to any other medical or educational records that reflect

any significant impact of claimant's motor tics on his ability to function.  In any event,

as discussed below, the evidence marshaled by the ALJ in concluding that the

claimant did not have marked impairments in any of the six "domains" does not

support a finding of marked impairment in any two of the functional areas that make

up the second part of the requirements to meet Listing 112.07.

### B.    Functional Domains

As discussed above, if the claimant's condition does not meet or medically

equal a specifically listed impairment, the ALJ must determine whether claimant has

an impairment or combination of impairments that functionally equals a listing.  The

functional equivalence determination is based upon an analysis of six domains: (1)

acquiring and using information; (2) attending and completing tasks; (3) interacting

and relating with others; (4) moving about and manipulating objects; (5) caring for

oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  The ALJ

decided that A.O. had no limitation in moving about and manipulating objects and less

than marked limitations in the other five childhood domains.  (T. 64-69).  Plaintiff

argues that, when all of the relevant evidence in the record is properly considered, the

ALJ's findings were not supported by substantial evidence.  In particular, plaintiff

appears to contend that the claimant had at least marked limitations in three

domains–acquiring and using information, attending and completing tasks, and caring

for himself.  (Pltf.'s Brief at 24-25).[5]

## 1.    Acquiring and Using Information

In assessing the domain relating to acquiring and using information, the ALJ

must consider how well a child acquires or learns information, and how well he can

use the information he has learned.   20 C.F.R. § 416.926a(g).  A school-age child (*i.e.*

at least six, younger than twelve) should be able to read, write, perform math, and

---

[5] Plaintiff did not specifically contend that the ALJ erred in his findings of less than marked impairments in the domains of interacting and relating to others and health and physical well being, and no impairment in moving and manipulating objects.  (Pltf.'s Brief at 24-25).  The Commissioner's brief correctly documents that the ALJ's findings with respect to these domains were supported by substantial evidence.  (Deft.'s Brief at 23, 25).

discuss history and science.  The child should be able to demonstrate these skills both in academic situations and in daily living.  20 C.F.R. § 416.926a(g)(2)(iv).  The applicable regulations provide examples of limited functioning with respect to this domain.  For example, a child might have limited functioning if he or she does not demonstrate understanding of words about space, size, or time; cannot rhyme words or the sounds in words; has difficulty recalling information learned in school the previous day; has difficulty solving mathematical problems; and/or talks in short, simple sentences and his difficulty explaining what he or she means.  20 C.F.R. § 416.926a(g)(3).

In finding that the claimant had less than marked limitations in this domain, the ALJ relied heavily on Dr. Prowda, the non-examining State agency psychiatrist, who reached the same conclusion in May 2007.[6]  Dr. Prowda noted that A.O. was in special education pre-kindergarten class, and was no longer in speech and language classes. (T. 387; 64).  She further noted prior reports by consulting examiners, Dr. Barry and Ms. Munski, that A.O. had average receptive and expressive language skills; that his IQ testing was in the average range; that A.O. was able to understand age-appropriate instructions and directions; and that the claimant could complete age-appropriate

---

[6] *See* 20 C.F.R. § 416.927(f)(2) (ALJs must consider the findings of state agency medical consultants and other program physicians because they are highly qualified and are also experts in Social Security disability evaluations); *Diaz v. Shalala*, 59 F.3d 307, 313 n. 5 (2d Cir. 1995) (the opinions of non-examining sources may override treating sources' opinion provided if they are supported by evidence in the record).

tasks.  (T. 387; 64, 371-73, 375-77).

The ALJ also noted some of the more recent evidence, from educational and

medical records, regarding claimant's limitations in acquiring and using information:

> On June 4, 2009 Joseph McNamara, the child's teacher, completed a
> questionnaire and advised that the child had a very serious problem recalling
> and applying previously learned material and applying problem-solving skills in
> class discussions and a serious problem comprehending and doing math
> problems and expressing ideas in written form.  "He needs additional support
> for his writing and other independent activities.  Once he understands what he
> has to do, he can usually grab the concept.  It takes time and direct eye
> contact[.]"  [(T. 199-200).]
>
> The child is of low average to average cognitive ability.  He has problems
> recalling previously learned material and had to go to summer school to address
> that problem.  His problem solving skills are weak and he needs adult
> supervision.  He attended summer school to address the problem of retaining
> previously learned material.  [(T. 187-89, 200, 208-211).]

(T. 64-65).

The ALJ must set forth the essential considerations upon which the decision

was based with sufficient specificity so as to enable the reviewing court to determine

whether the disability determination was supported by substantial evidence.  However,

an ALJ is not required to explicitly set forth and analyze every piece of conflicting

evidence in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir.

1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require

an ALJ explicitly to reconcile every conflicting shred of medical testimony).  The ALJ

could have more clearly explained how he reconciled the seemingly mixed evidence

regarding the extent of claimant's limitations in this domain.  However, he properly

referenced the evidence on both sides of the issue and marshaled substantial evidence supporting his conclusion that A.O. limitations were less than marked.

The ALJ's decision referenced (T. 60) an evaluation of claimant by a school psychologist[7] in July 2004, which included cognitive testing that scored claimant at 1.5 standard deviations below the mean score.  (T. 252-253).  Results of such testing at less than two standard deviations below the mean is one of the criteria for classifying cognitive limitations as less than marked.  20 C.F.R. § 416.926a(e)(2)(iii). A more recent (October 2007) psycho-educational reassessment of the claimant by school psychologist Robert Magee showed marked improvement by claimant on several standard tests of intelligence and academic and language skills.  (T. 187-89). To the extent claimant's testing results were reported in terms of standard deviations, he scored above the mean in most categories, and was always within one standard deviation when his score fell below the mean.  (T. 187-88).  Results of October 2007 assessment indicated that claimant had average verbal and well above-average nonverbal cognitive reasoning skills.  Dr. Magee found that A.O.'s visual-motor abilities were in the low-average range.  Claimant's individual achievement testing indicated scattered academic readiness skills, with functional levels ranging from average to significantly below.  (T. 189).

---

[7] *See* 20 C.F.R. § 416.913(d)(2) (ALJ may use evidence from educational personnel, *e.g.*, teachers and counselors, to determine the severity of a claimant's impairments and how they affect his/her ability to function).

Other medical evidence referenced by the ALJ in his decision (T. 61, 63) includes records of claimant's treatment by Dr. Sanchez at Oswego Hospital, Behavioral Services Division between March and May 2009. This psychiatrist concluded that A.O.'s intellectual functioning seemed "average" and his report included the notation "rule out learning disabilities." (T. 414-15).

An evaluation of claimant by a BOCES occupational therapist from March 2007 noted that A.O. "continues to present with decreased sensory processing, visual perceptual and visual motor skills which impact on his overall academic performance." (T. 217). A BOCES report issued in November 2007 recommended that the claimant continue to receive occupational therapy services to address these areas of difficulty. (T. 217). However, by March 2008, claimant's IEP from the Fulton City School District reflected the conclusion that A.O.'s fine motor and sensory processing abilities had become "adequate" and recommended that his occupational therapy consult service could be discontinued. (T. 211). His teacher reported, in March 2008, that claimant had successfully "mainstreamed" into a regular kindergarten classroom for reading, calendar, math, specials, and playtime and concluded that "he is capable of academically performing at a kindergarten level." (T. 210).

While the medical, educational, and other evidence was not completely consistent, this court finds that the ALJ adequately assessed the relevant portions of

23

the record.  His finding that the claimant's limitations in the acquiring/using information domain were less than marked is supported by substantial evidence.  *See, e.g., Hudson v. Astrue*, 1:06-CV-1342 (LEK/VEB), 2009 WL 1212114, at *6-7 (N.D.N.Y. Apr. 30, 2009) (upholding an ALJ's finding of a less than marked limitation with respect to acquiring and using information, notwithstanding the conclusion of claimant's teachers that he had some "serious" and "very serious" cognitive limitations, because it was supported by substantial evidence from educational records, standardized testing, and the opinion of claimant's treating psychiatrist); *Torres v. Commissioner*, 09 CV 59, 2010 WL 2674543, at *7 (E.D.N.Y. June 30, 2010) (upholding Commissioner's finding that claimant, who received some special education instruction and had a low average IQ score that fell within two standard deviations of the mean, had less than marked limitations in acquiring and using information).

### 2.    Attending and Completing Tasks

In this domain, the Commissioner considers the child's ability "to focus and maintain . . . attention," and how well he can "begin, carry through, and finish . . . activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them." 20 C.F.R. § 416.926a(h).  With regard to this domain, a school-age child is expected to focus attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom

and homework assignments.  The child should be able to concentrate on details and

not make careless mistakes in work (beyond what would be expected in other children

of like age who do not have impairments).  The child should be able to change

activities or routines without distracting himself/herself or others, and stay on task and

in place when appropriate.  The child should be able to sustain attention well enough

to participate in group sports, read independently, and complete family chores. The

child should also be able to complete a transition task (*e.g.*, be ready for the school

bus, change clothes after gym, change classrooms) without extra reminders and

accommodation.  20 C.F.R. § 416.926a (h)(2)(iv).

The ALJ found that A.O. had a less than marked limitation in this domain, again

relying on the analysis of the non-examining State agency psychiatrist, who reached

the same conclusion in May 2007.  (T. 65).  Dr. Prowda noted the consultative

examiner's report that A.O. had difficulty staying still in his chair and needed

redirection, but had maintained appropriate eye contact, had been cooperative, recalled

and understood directions, and could complete age-appropriate tasks.  (T. 65; 387;

376-77).  The ALJ also noted the statement of claimant's first grade teacher that A.O.

had a very serious problem focusing long enough to finish assigned activities or tasks,

and a serious problem carrying out multi-step instructions and organizing his own

things.  However, Mr. McNamara observed that A.O. was better at completing tasks

when he had adult assistance.  (T. 65, 201).  The teacher further noted that A.O. had

no problems paying attention when spoken to directly, sustaining attention during play/sports activities, carrying out single-step instructions, waiting to take turns, and changing from one activity to another without being disruptive.  (T. 201).  The ALJ also observed that recent changes in A.O.'s  medications were improving his ability to follow directions and pay attention.  (T. 65; 411-12).

The ALJ did not directly reference several educational reports which discussed claimant's limitations with respect to concentration and focus in the classroom.  A teacher evaluation from Oswego BOCES in March 2007 observed that A.O. "had a hard time listening and following teacher directions" and "is easily distracted by his surroundings and has a tendency to rush through his work."  (T. 216).  A functional behavioral assessment by the Fulton City School District in December 2008 found that A.O. was "disruptive" in class and that his "refusal to follow directions impacts [his] ability to successfully complete learning activities."  (T. 158).  However, the educational records from 2007 and 2008 all reflect that A.O. was making significant progress in his self control and required less management by adults to function in the classroom.  (T. 188-189, 159).  The ALJ also referenced the most recent educational assessment of A.O.'s limitations in this domain by his first grade teacher (T. 201), and thus, adequately assessed the most probative evidence from educational records.

As the ALJ noted, Dr. Sanchez of Oswego Hospital adjusted claimant's medication in the months before the administrative hearing.  Dr. Sanchez reported, in

26

April 2009, that A.O. was "doing much better at school and at home, because he is now able to follow directions and to pay attention much better than before."  (T. 412). In May 2009, this psychiatrist noted that the claimant was "doing well in terms of no longer being disruptive."  (T. 411).  As the ALJ noted (T. 62), the plaintiff acknowledged that, with the new medications, A.O. was "more controllable" (T. 23), and that his behavioral issues have improved somewhat (T. 27-29, 42).

The ALJ could have more clearly explained how he reconciled the seemingly mixed evidence regarding the extent of claimant's limitations in this domain. However, he properly considered the most significant medical and educational evidence and marshaled substantial evidence supporting his conclusion that A.O. limitations were less than marked with respect to the domain of attending and completing tasks.  *See, e.g., Hudson v. Astrue*, 2009 WL 1212114, at *8-9 (upholding the ALJ's finding that claimant's limitations in attending and completing tasks were less than marked, despite observations about some "serious" problems in related areas by teachers, because the finding was supported by substantial evidence, including the opinion of the treating psychiatrist that claimant's attention span was "fine" on the current medication); *Gomes v. Astrue*, 633 F. Supp. 2d 171, 185-86 (S.D.N.Y. 2009) (affirming finding that claimant diagnosed with ADHD had less than marked limitations with respect to attending and completing tasks, where claimant's symptoms had diminished with medication) (collecting cases).

### 3. Self-Care

In this domain, the Commissioner considers the child's ability to "maintain a healthy emotional and physical state, including how well he or she gets physical and emotional wants and needs met in appropriate ways; copes with stress and changes in environment; and whether the child can take care of his or her own health, possessions, and living area. 20 C.F.R. § 416.926a(k). With regard to this domain, a school-age child is expected to be independent in most day-to-day activities (*e.g.*, dressing, bathing), although the child may still need to be reminded sometimes to do these routinely. The child should begin to recognize that he or she is competent in doing some activities and has difficulty with others. The child should begin to develop understanding of right and wrong, and what is acceptable and unacceptable behavior. He or she should begin to demonstrate consistent control over behavior, and avoid behaviors that are unsafe or otherwise not beneficial. 20 C.F.R. § 416.926a (k)(2)(iv).

The applicable regulations provide examples of limited functioning with respect to this domain. For example, a child might have limited functioning if he or she continues to place non-nutritive or inedible objects in his or her mouth, often uses self-soothing activities showing developmental regression or has restrictive or stereotyped mannerisms, does not dress or bathe himself age appropriately; engages in self-injurious behavior or ignores safety rules, does not spontaneously pursue

enjoyable activities or interests, and/or has a disturbance in eating or sleeping patterns.
20 C.F.R. § 416.926a(k)(3).

The ALJ found that claimant has a less than marked limitation in the ability to
care for himself.  (T. 67-68).  This was supported by Dr. Prowda's assessment that
A.O. had a less than marked limitation, based on the consultative examiner's finding
that A.O. did self-care at home with assistance, was able to understand simple
instructions and directions, and was able to adequately express his needs.  (T. 68; 388;
373, 377).

The ALJ noted the assessment of claimant's first grade teacher that A.O. had
very serious problems taking care of personal hygiene and caring for physical needs.
(T. 68; 204).  Mr. McNamara stated that A.O. had urination accidents "on occasion."
(T. 205).  The ALJ referenced medical records indicating that A.O.'s enuresis
condition had improved, and noted that plaintiff had not reported the condition to Dr.
Trust and Dr. Sanchez–her son's most recent treating doctors.   (T. 68; 394, 411-12,
414-16).  Dr. Weisner, plaintiff's prior pediatrician for several years, also indicated
that A.O. showered in the morning, after wetting the bed at night.  (T. 394).
Claimant's mother testified at the hearing that, with medication, A.O. only wet the bed
"maybe like three times a week."  (T. 45; 63).

The only other problems observed in this domain by A.O.'s teacher were a
"slight" problem in handling frustration appropriately, being patient when necessary,

and responding appropriately to changes in his own mood.  (T. 204).  Mr. McNamara found, *inter alia*, that A.O. had no problems using good judgment regarding personal safety and dangerous circumstances, identifying and appropriately asserting emotional needs, and using appropriate coping skills to meet daily demands of the school environment.  (T. 204).

As the ALJ noted (T. 61), Dr. Sanchez reported that plaintiff had problems sleeping.  (T. 412).  However, the psychiatrist adjusted A.O.'s medication, and the sleeping problems were not mentioned during claimant's last visit to this doctor in May 2009.  (T. 411).  During the hearing, on June 30, 2009, plaintiff reported that A.O. was no longer having trouble sleeping since Dr. Sanchez prescribed Clonidine. (T. 21-22, 24-25, 41).

There was substantial evidence supporting the ALJ's finding that claimant's limitations in the self care domain were less than marked.  While the ALJ appropriately noted A.O.'s continuing problems with enuresis, and related hygiene issues, this factor did not rise to the level of a marked limitation in this domain.  *See, e.g., Blaine v. Astrue*, 4:09cv104, 2010 WL 3291824, at *13 (E.D. Va. June 3, 2010) (upholding a finding of a less than marked limitation in the self care domain notwithstanding evidence of recent bed wetting related to claimant's unstable living situation); *Machadio v. Apfel*, 98 CV 7633, 2001 WL 477248, at *3, 6 (E.D.N.Y. Mar. 29, 2001) (claimant experienced nocturnal enuresis, but this did not rise to the level of

30

a marked limitation).[8]

## C.    The ALJ's Assessment of Plaintiff's Claims of Subjective Symptoms

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. § 416.929(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's

---

[8] *Cf. Straw v. Apfel*, 98 Civ. 5089, 2001 WL 406184, at *9 (S.D.N.Y. Apr. 20, 2001) (the fact that claimant was withdrawn from school two years in a row due to his enuresis is substantial evidence of at least moderate impairment in the area of personal function, which the ALJ ignored in the record).  In this case, the ALJ properly considered claimant's enuresis symptoms, which were never so severe as to keep A.O. out of school, and which improved with age.

symptoms to determine the extent to which it limits the claimant's capacity to function.  20 C.F.R. § 416.929(c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. § 416.929(c)(3).

The ALJ summarized plaintiff's claims regarding her son's subjective symptoms and limitations.  (T. 62-63).  After considering the medical evidence, the ALJ concluded that plaintiff's medically determinable physical impairments could reasonably be expect to cause the alleged symptoms.  (T. 63).  However, the ALJ found that "the statements concerning the intensity, persistence and limiting effects of the child claimant's symptoms made by the mother  are not entirely credible and appear overstated."  (T. 63).  In his analysis, the ALJ discussed A.O.'s daily activities, the specifics of his physical symptoms, factors which aggravated his symptoms, the types and effectiveness of his medications, and other measures taken by the claimant

and his teachers and care givers to mitigate his symptoms.  (T. 62-63).

The ALJ pointed out significant inconsistencies in plaintiff's various statements about her son's symptoms and conflicts between her characterization of his behavioral and other problems and contrary evidence from the medical and educational records. (T. 61-62).  For example, the ALJ noted plaintiff's testimony that her son liked to "push buttons" with his teachers, and had tussles with other children.  (T. 62; 32, 34, 39-40).  Plaintiff stated claimant had never been suspended from school, but had come close; he had been sent to the "refocus room" at school at least once, for tipping things over and fighting.  (T. 34-35, 38-40).  She testified that A.O. usually had a behavior problem at home, in that he did not like to listen to her or his sisters.  A.O. got mad when he did not get his way, and, before his medication was changed, he would throw and tip things over.  (T. 26-28, 31-32, 42-43).  On the other hand, plaintiff also testified that the claimant got along pretty well with her and his siblings and friends in the neighborhood, and that A.O. knew his mother was the "boss."  (T. 27, 31-32).  The plaintiff acknowledged that her son now rarely threw or tipped over objects in anger, and that she could usually prevent his behavior from escalating into a tantrum. (T. 42-43).  The ALJ noted plaintiff's own statement that A.O.'s behavior had improved on his new medication, as well as treatment records from Dr. Sanchez documenting significant improvement within a few months of changing medication.  (T. 62-63; 27-28, 411-12).

A.O.'s first grade teacher, Mr. McNamara, stated on June 4, 2009 (less than one month before the hearing), that A.O. had no problems in the domain of interacting and relating with others, and his functioning appeared age appropriate (T. 202; 66).  He further noted that it had not been necessary to implement behavior modification strategies for A.O.  (T. 202).  Mr. McNamara also stated that the claimant had no problem identifying and appropriately asserting emotional needs and using appropriate coping skills to meet daily demands of the school environment.  (T. 204).

While earlier educational records noted that A.O. had a history of disruptive behavior, he appeared to steadily improve in this area.  In a report dated October 17, 2007, school psychologist Robert Magee stated that A.O. had clearly made significant progress in the areas of management and self-control.  (T. 189).  A behavioral assessment suggested that claimant's classification of "ED" (emotionally disturbed) should be reviewed, given that reported disruptive behaviors "have seemed to decrease since [A.O.] has transitioned to the school age environment. . . ."  (T. 159). Following a recommendation by the school psychologist in October 2007 (T.189), A.O.'s classification was changed from ED to OHI (other health impaired) in December 2007.  (T. 214).

The ALJ evaluated the objective medical and educational evidence and reasonably determined that it was inconsistent with some of plaintiff's subjective claims regarding the intensity and duration of her son's symptoms.  The medical and

educational records reflected marked improvements in claimant's cognitive functioning and his academic performance, with decreasing remedial services and supervision.  Recent changes in A.O.'s medication appeared to significantly mitigate his problems with hyperactivity and losing focus and concentration.  With regards to Plaintiff's testimony that A.O. usually had trouble getting to the bathroom on time (T. 43-44), the ALJ  noted medical records indicating improvement with his enuresis, and the absence of any complaints of enuresis to Dr. Trust and Dr. Sanchez.  (T. 68; 393-94, 411-12, 414-16).

Plaintiff testified about her son's continuing problem with tics and repetitive physical motions (such as rocking), but noted that A.O.'s doctor had recently prescribed Clonidine to address that problem.  (T. 23-24).  Dr. Sanchez noted plaintiff's continuing complaint about A.O.'s  tics during the last examination reflected on the record, on May 22, 2009.  (T. 411).  However, plaintiff points to no other evidence in the record indicating that tics significantly impaired claimant's ability to function.  During the hearing on June 30, 2009, the ALJ observed claimant and noted no tics.  (T. 63).

The ALJ was not obligated to accept plaintiff's testimony about her son's subjective symptoms and restrictions without question, and has the discretion to evaluate credibility in light of the evidence in the record.  *See, e.g., Aponte v. Secretary, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (it is

the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant).  A court must uphold the Commissioner's decision to discount a claimant's complaints of pain and other subjective complaints if the finding is supported by substantial evidence.  *Id.*; 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.")  The court agrees with plaintiff (Pltf.'s Brief at 22-23) that the ALJ's personal observations about the causes for some of the claimant's behaviors  (T. 63) were not particularly useful in assessing the credibility of the plaintiff's statements about her son's problems.  Nonetheless, this court concludes that there is substantial, reliable evidence supporting the ALJ's determination that plaintiff's statements concerning the intensity, duration and limiting effects of her son's symptoms were not entirely credible, and were sometimes overstated.

### D.    The ALJ's Development of the Record

Plaintiff contends that, in analyzing whether A.O.'s impairments met or equaled a listed impairment, the ALJ failed to make reasonable efforts to obtain a medical opinion from claimant's treating physicians–Dr. Weisner and Dr. Sanchez.  (Pltf.'s Brief at 19-21).  Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical record if it is

36

incomplete.  *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. §

416.912(d) ("We will make every reasonable effort to help you get medical reports

from your own medical sources when you give us permission to request the reports.")

In furtherance of the duty to develop the record, an ALJ may re-contact medical

sources if the evidence received from the treating physician or other medical sources

is inadequate to determine disability, and additional information is needed to reach a

determination.  20 C.F.R. § 416.912(e).  In this case, the ALJ made reasonable efforts

to obtain evidence from the two treating physicians, and the medical record was

adequate to make his determination, without formal opinions from those doctors.

 The Social Security Administration sent correspondence to plaintiff's attorney

on March 2 and March 20, 2009 requesting information about claimant's recent

medical treatment and soliciting the submission of any additional relevant evidence,

prior to the administrative hearing.  (T. 82-83, 153-54).  Plaintiff's attorney submitted

additional evidence, including medical records from Dr. Weisner from February 12,

2007 to October 29, 2008.  Plaintiff also submitted a statement that the claimant was

treated by Dr. Sanchez on three occasions in March and April 2009, but that plaintiff

was not sure yet what the doctor had said about A.O.'s condition.  (T. 166-69, 171,

207, 237, 391-410).  At the conclusion of the administrative hearing on June 30, 2009,

the ALJ held the record open so that plaintiff's attorney could submit additional

evidence from Dr. Trust and Dr. Sanchez of Oswego Hospital Behavioral Health.  (T.

49-50).  The Social Security Administration then contacted the attorney because no

further evidence was received, and subsequently granted plaintiff an additional

extension of time to obtain the evidence.  (T. 238-40).  The evidence was ultimately

submitted by plaintiff's attorney in late August 2009, and was considered by the ALJ

in his decision.  (T. 61-62, 241, 411-415, 416, 418-24).  Plaintiff's contention that the

ALJ unreasonably failed to obtain medical opinions from Dr. Weisner and Dr.

Sanchez is unfounded, in light of the extensive opportunities that plaintiff was given

to provide additional evidence from those sources.

    The ALJ was not required to seek formal opinions from the two treating sources

when the record already contained adequate medical evidence from both doctors.  *See*

20 C.F.R. § 416.912(d)-(e).  Plaintiff's counsel proffered the records of these treating

sources without any request that the ALJ obtain further reports or grant her more time

to do so.  (T. 169, 241, 418).  As documented above, the medical evidence of record

was adequately developed for the ALJ to determine that claimant was disabled,

notwithstanding the lack of formal opinions from Dr. Weisner and Dr. Sanchez.

Moreover, as discussed further below, the record evidence from  Dr. Weisner and Dr.

Sanchez does not indicate that claimant's conditions met or functionally equaled a

listed impairment.

    On February 27, 2007, Dr. Weisner noted reports by claimant's mother that

Adderall XR was helping a lot to improve his behavior.  (T. 401).  On June 5, 2007,

the doctor again noted reports that A.O. did much better at home and at school with

Adderall.  (T. 399).  On November 14, 2007, Dr. Weisner stated that A.O. had an

incontinence accident the prior day, but that it was the first such daytime accident in

awhile.  Dr. Weisner concluded A.O.'s enuresis during the day was greatly improving.

(T. 394).  On July 29, 2008, Dr. Weisner noted reports that A.O. took his medication

pretty much every day, and that his behavior both at home and at school seemed to be

"okay."  (T. 393).  These treatment notes indicate significant improvement in

claimant's ADHD symptoms and enuresis.

Dr. Sanchez began treating A.O. on March 18, 2009–less than six months prior

to the ALJ's decision.  (T. 61, 167, 171, 237, 241, 411-12, 414-15).  Dr. Sanchez's

treatment notes indicate that claimant's symptoms had significantly improved with

medication.  For example, the doctor's note on April 23, 2009, stated that A.O. was

doing much better at school and at home; he was much better able to follow directions

and to pay attention, and was no longer overtly hyperactive.  (T. 412).  On May 22,

2009, A.O.'s mother reported continuing motor tics, but Dr. Sanchez noted that A.O.

was doing well in terms of no longer being disruptive.  (T. 411).  On examination,

A.O. was slightly hyperactive; his mood seemed mildly anxious to euthymic[9]; his

affect was mildly constricted; and his  judgment and impulse control were mildly

impaired.  (T. 411).  Dr. Sanchez's records revealed that the doctor was adjusting

---

[9] Euthymic means "pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated."  *Mosby's Medical Dictionary*, 8th edition.

claimant's medications and dosages over several months, and that A.O.'s primary symptoms had improved considerably in a short time.   (T. 411-12, 414-15).

In sum, neither Dr. Weisner's nor Dr. Sanchez's treatment notes support plaintiff's suggestion that A.O. had an impairment of the severity to meet, medically equal, or functionally equal a listed impairment.  The ALJ did not err by not recontacting Dr. Weisner and Dr. Sanchez, given that the record was otherwise adequate for the ALJ to make his disability determination.  *See Aldrich v. Astrue*, 5:08-CV-402, 2009 WL 3165726, at *7 (N.D.N.Y. Sept. 28, 2009) (a treating physician is recontacted only in situations where the evidence from treating or other medical sources is insufficient for the ALJ to determine whether a claimant is disabled); *Rosa v. Callahan*, 168 F.3d 72, 79, n.5 (2d Cir. 1999) ("where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim").  *See also Tirado v. Bowen*, 842 F.2d 595, 596 (2d Cir. 1988) (noting that ordinarily claimants should have one opportunity to prove entitlement, otherwise proceedings would be an unending merry-go-round).

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the

40

plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: November 12, 2010


**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

41